IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 25-19605-LSS |
| | ) | (Chapter 11) |
| 5410 30TH STREET DC LLC | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**OBJECTION TO APPROVAL OF
DEBTOR'S PROPOSED DISCLOSURE STATEMENT**

Comes now IBI Falcon US LLC ("IBI Falcon"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 2002(b)(1)(A), and hereby objects to approval of the disclosure statement (the "Disclosure Statement"), DE #121, filed by 5410 30th Street DC LLC (the "Debtor"), and in support thereof states as follows:

**I.      Introduction**

The Debtor is asking this Honorable Court to approve the Disclosure Statement so votes may be solicited on a plan of reorganization (the "Plan"), DE #120, under which the Debtor proposes to sell real property, at some undisclosed juncture in the future, on some combination of undisclosed terms, for some undisclosed price. In so doing, the Debtor neglects to mention that the subject property has now been on the market for approximately 200 days and currently features a listing price of more than $1 million *less* than the scheduled value of the asset in this case.

The Debtor is also seeking to confirm a plan of liquidation that (i) does not actually place most creditors in classes, (ii) somehow places at least one expressly-unclassified creditor in a class, (iii) seeks to release secured creditors' liens *before* a sale of property occurs, (iv) contains an impermissible exculpation clause, (v) exempts counsel for the Debtor from filing a fee application; (vi) appears to cite to a Supreme Court order granting *certiorari* in a case, in lieu of citing to the

1

actual ensuing Supreme Court opinion in the case; and (vii) contradicts the Disclosure Statement vis a vis the impairment, *vel non*, of at least one class.

Making matters worse, the Disclosure Statement does not contain adequate information. The Debtor's seemingly sole asset is a parcel of real estate and the improvements thereupon located at 5631 Macarthur Blvd., NW, Washington, DC 20016 (the "Property"). Yet the Disclosure Statement does not so much as feign to (i) address the value of the Property; (ii) indicate the current asking price for the Property (which, as noted *supra*, is more than $1 million *less* than what is scheduled in this case); (iii) discuss the history of the Property being marketed for sale; or (iv) explain what happened to the Debtor's prior, eponymous real estate holding. Nor does the Disclosure Statement lend any insight into the approximate sum of fees due to administrative creditors (including the Debtor's counsel). Nor does the Disclosure Statement contain a liquidation analysis.

IBI Falcon has previously suggested "the Debtor is loitering in chapter 11 at the expense of creditors, and doing so in a manner that seemingly prizes inaction over action and hostility over cooperation." Motion to Convert Case to Chapter 7, DE #95, at § I. Unfortunately, the Plan and Disclosure Statement do little to dispel this concern, being seemingly perfunctory filings docketed with the aim of continuing to drag out a saga in which the Debtor is relentlessly unforthcoming about material facts and through which the very creditors to whom a fiduciary duty is owed are suffering as a direct result of the Debtor's intransigence.

For these reasons, and as extrapolated upon *infra*, IBI Falcon objects to approval of the Disclosure Statement.

II.     **Argument: The Disclosure Statement Should Not be Approved**

a.  **The Plan is Patently Unconfirmable**

Liquidating plans are not uncommon, especially in cases—such as this—where the at-issue debtor holds but a single real estate asset. Yet the Plan proposed by the Debtor *sub judice* is wildly at odds with those that so often grace the docket of this Honorable Court and sister courts, being a sale plan without any sale-centric constraints. Equally problematically, the Plan is rife with provisions that offend chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and other governing laws.

As noted by this Honorable Court: "While courts ordinarily reserve confirmation issues for the confirmation hearing, a court may disapprove a disclosure statement where the underlying plan is clearly unconfirmable." *In re Wong*, 598 B.R. 827, 829 (Bankr. D. Md. 2019) (citing *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 153-55 (3d Cir. 2012)). *See also In re Alexander Props., LLC*, 2011 Bankr. LEXIS 5498, at *5-6 (Bankr. D. Md. Sep. 29, 2011) ("A court may deny approval of a disclosure statement because it describes an uncomfirmable plan. It is a waste of all parties' resources for the court to approve such a disclosure statement and set the parties on the course of preparing for a confirmation hearing on a plan that is not legally viable.") (citing *In re Quigley Co., Inc.*, 377 B.R. 110, 115-116 (S.D.N.Y. 2007)).

Here, the Plan is unconfirmable for at least four reasons: (i) the sale provision is so broad and vague as to not "provide adequate means for the plan's implementation," 11 U.S.C. § 1123(a)(5); (ii) the Plan strips secured creditors of their liens *before* any sale occurs, 11 U.S.C. § 1129(b)(2)(A)(i)(I); (iii) the Plan contains an impermissible exculpation and release; and (iv) the

Plan seeks to compensate counsel without requiring fees and expenses be approved by this Honorable Court, 11 U.S.C. § 330(a)(1).

The sale provision is the most egregious issue: the Plan provides the Debtor will sell the Property but does not dictate any timeline (or deadline) for such a sale, does not set forth any price (or price range) for such a sale, and does not set forth any terms (including the payment of commissions—whether to an insider representing the seller or a third party representing a buyer) for such a sale. Article 6—titled "Implementation of the Plan"—provides, *inter alia*, "[t]his Plan will be funded from one (1) source: Net Sales Proceeds generated by the sale of the Debtor's Real Property Asset in accordance with the Confirmation Order and any Sale Order." *See* Plan, DE #120, at § 6.2. Yet nowhere does the Plan specify by *when* such a sale is to occur. Nor do the Plan or Disclosure Statement even suggest how much is likely to be generated from such a sale. *See* Plan, DE #120, *passim*; Disclosure Statement, DE #121, *passim*.

As-written, the Plan allows the Debtor to market the Property for sale, for however long the Debtor may wish. There is literally no outside date or temporal check—the Debtor will be permitted to market the Property, as creditors go wholly unpaid, for however long the Debtor may so wish, no matter the interest that may continue accruing and no matter how hopeless a sale capable of paying secured claims may become. And this is accordingly not merely a wholesale failure of the dictates of Section 1123(a)(5), insofar as these are assuredly *not* "adequate means for the plan's implementation," but, seemingly, also a violation of the rule against perpetuities, *see Coin Automatic Laundry Equip. Co. v. Hampton Plaza, LLLP*, 2017 U.S. Dist. LEXIS 22092, at *16-17 (D. Md. Feb. 16, 2017) ("Under the common law Rule against Perpetuities, '[n]o interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the

4

creation of the interest.'") (quoting *Selig v. State Highway Admin.*, 861 A.2d 710, 717 (Md. 2004) (quoting John Chipman Gray, *The Rule Against Perpetuities*, § 201 (4th ed. 1942))).

Lest the reference to the rule against perpetuities seem arcane, such is actually of particularized import in the chapter 11 context, where a plan cannot be confirmed unless, *inter alia*, "[a]ll transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust." 11 U.S.C. § 1129(a)(16).

The lack of a temporal limitation on a sale date also creates a pragmatic problem: the Plan promises to pay priority tax claims, in full, on "the effective Date or as soon thereafter a reasonably practicable," *see* Plan, DE #120, at § 3.3, but has no funding mechanism other than a sale of the Property, *id.* at § 6.2. If the Property is not to be sold by the effective date, there will not be funds available to make these payments. Yet the Plan very clearly does *not* commit to selling the Property by the effective date and, instead, simply posits the effective date will be some ill-defined date, of the Debtor's unilateral election, within 90 days of the Plan being confirmed. *See* Plan, DE #120, at § 2.1.39.

Equally problematically, the Plan immediately strips secured creditors (including IBI Falcon) of their liens:

> Except as otherwise provided herein, as of The [sic] Effective Date, any Lien securing any Secured Claim shall be deemed released and discharged, and the Holder of each such Secured Claim shall be authorized and directed to release any Collateral  or other property of the Debtor held by such Holder and to take such actions as may be reasonably requested by the Debtor to evidence release of such Lien, including without limitation, by the execution, delivery, and filing or recording of such releases as may be requested by the Debtor.

Plan, DE #120, at § 9.4. *See also id.* at § 5.1(B) ("The Holder of the IBI Falcon Secured Claim shall release any lien on the Real Property Asset, with any such lien attaching to the proceeds of any sale. . .").

5

The Debtor is not permitted to strip IBI Falcon (or any other secured creditor) of a lien on the Property, absent the consent of the at-issue creditor. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(I) (requiring, for a plan to be "fair and equitable," that objecting parties holding liens ". . . retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims."). For the avoidance of doubt, and to state what is likely quite obvious: IBI Falcon will *not* accept the Plan, and the provisions of Section 1129(b) would thereby be necessarily invoked in connection with any confirmation of the Plan. The Debtor cannot satisfy these rigors when the Plan—largely inexplicably—seeks to immediately strip IBI Falcon of its lien.

The mischief that might be accomplished, by allowing the Debtor to continue to market the Property without any temporal limitations, and without any liens encumbering the asset, is readily imaginable. Which makes the Plan's exculpation clause all the more bewildering: the Debtor is seeking to be exculpated (and to have its agents exculpated) for *all* conduct undertaken in connection with the Plan. *See* Plan, DE #120, at § 10.3.

The exculpation clause—alongside an adjoining release, *see id.* at § 10.2—is equally problematic in the prism of a case where the Debtor's conduct has been so often deeply suspect. As noted *supra*, the Debtor has never disclosed that the Property is currently being marketed for more than $1 million *less* than the scheduled value thereof. The Debtor is currently pursuing a seemingly-spurious claim for a stay violation, pegged to the actions of a creditor not on notice of this case. The Debtor is also objecting to IBI Falcon's claim on grounds that appear to amount to a suspicion concerning whether the entity actually holds the debt (when the Debtor has not suggested any other entity to hold the debt). So while no Rule 9011 letters have been sent, let alone transmuted into Rule 9011 motions, it merits notation that this is a case where sanctions may well

6

ultimately befall the Debtor for any number of actions or inactions. Yet the Debtor, without ever addressing the rationale for such in the Disclosure Statement, is insisting upon broad exculpation.

Of course, the normal mechanism for addressing unnecessary litigation gamesmanship would be through a challenge to the reasonableness and necessity of counsel's fees. And such is, no doubt, why nothing as animated as a Rule 9011 letter has been as-yet sent in this case. The Plan, however, seems to have an impermissible answer for this, too:

> As of the Effective Date, the Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of the Professionals employed by the Debtor in connection with the implementation and consummation of this Plan, the claims reconciliation process, and any other matters as to which such Professionals may be engaged.

Plan, DE #120, at § 13.1.

This provision is plainly illegal: the Bankruptcy Code requires, much to the opposite, that professional fees be approved by this Honorable Court. *See* 11 U.S.C. § 330. To be sure, it is not uncommon for a plan to provide that post-effective date fees are not subject to review, though that does *not* appear to be what is provided for here. And, even if that is what the Debtor intends to suggest here, a core problem remains: the Debtor had made clear it has but only a single asset with which to pay claims, and that asset (the Property) is seemingly remaining a part of the Debtor's estate post-confirmation, so the use of any proceeds thereof to pay professionals would require judicial approval. The Plan seems to be suggesting that secured creditors will lose their liens, the Property will be sold, proceeds thereof will be used—sans court approval—to pay professionals, and then whatever monies remain might be made available to pay creditors. Even if the liens of secured creditors attach to proceeds *before* professionals are paid, unsecured creditors are still entitled to have the opportunity to review, and object to, a fee petition before payment of such fees results in a diminution of their claim payments.

Other issues abound throughout the Plan as well. For one, nowhere does the Plan actually place creditors in classes, as required by section 1123(a)(1-3). While the Plan *does* establish classes, the Debtor has—bizarrely—established a regime whereby only the three creditors to have filed proofs of claim are actually placed in those classes. *See* Plan, DE #120, at § 5.4 ("The Claims Register listing all General Unsecured Claims is attached to the Disclosure Statement as Exhibit 2."); *id.*, Disclosure Statement, DE #121, at Exhibit 2 (pp. 71-72) (only attaching claims register). There are at least $925,000.00 of claims, not marked as disputed, contingent or unliquidated, disclosed on the Debtor's schedules but not reflected in the claims register; the Plan appears to ignore these claims, *en toto*. *See* Schedule E/F, DE #16, at §§ 3.5-3.6.

The Plan also indicates, in the preamble to Article 3, that administrative expense, priority and priority tax claims are "not placed . . . in a Class." Plan, DE #120, at § 3. This is certainly a normative election and would be uncontroversial, except the Plan then goes on to delineate a voting class #3 designated as "Allowed Priority Unsecured Claims." *Id.* at § 4.2. These two provisions are mutually exclusive.

Finally, on a less existential front, it bears notation that the Plan appears to have the wrong citation for *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, somehow citing to both the pre-certiori holding by the Eleventh Circuit ("2007 U.S. LEXIS 13007") and the Supreme Court's grant of certiorari ("552 U.S. 1074"), but not to the actual Supreme Court opinion (which is found at *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52-53 (2008)). The purpose for which the case is cited—affirming the tax benefits of a bankruptcy sale must be post-confirmation—is uncontroversial. And the form of the cite is assuredly not an enormous concern unto itself. But given the oddity of the citation being in the Plan in the first instance, the issue is meritorious of at least passing notation.

8

**b. The Disclosure Statement Does Not Contain Adequate Information**

Even putting aside the Plan being patently unconfirmable, the Disclosure Statement still suffers from coming well shy of containing adequate information. This case centers on the Property, yet vanishingly little is actually disclosed about the Property. And that is a fundamental problem.

As noted by the Fourth Circuit: "The disclosure statement must contain 'adequate information,' i.e. sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan." *Nelson v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co.)*, 1998 U.S. App. LEXIS 21387, at *10 (4th Cir. Aug. 31, 1998) (citing 11 U.S.C. § 1125(a)).

Here, the Debtor has scheduled the Property as having a value of $5 million. *See* Schedule A/B, DE #13, at § 55, p. 6. Those schedules were filed on October 29, 2025. *Id.* Yet—fully two months prior—the Debtor listed the Property for sale at $4,645,000.00. *See* https://www.zillow.com/homedetails/5631-Macarthur-Blvd-NW-Washington-DC-20016/436958_zpid/ (last accessed Mar. 17, 2026).[1] Four days before the schedules were filed, the listing price was dropped to $4,295,000.00. *Id.* Weeks later, the price went down to $3,999,900.00. *Id.* Shortly before the Plan was amended, the listing price was increased by $1.00 (not a typo—the increase is literally $1.00, with it being suspected this may have been an effort to cause the MLS system to display the Property in response to queries concerning recent price adjustments). *Id.*

---

[1] The Zillow records are clearly hearsay. IBI Falcon does not share these to prove the truthfulness of the matter asserted but, rather, to show the need for the Debtor to adequately inform creditors as to the sales and marketing history of the Property. If the Debtor suggested a different history to be accurate, IBI Falcon would subpoena MLS records to test the veracity of the Debtor's contentions. But, here, the Debtor is not offering *any* sale history, and that is the point being made.

Creditors who have been told the Property is worth $5 million are entitled to know the asset is being marketed for $3,999,901.00. Creditors are also entitled to know the asset has languished on the market for 200 days. Creditors are entitled to know the details of any listing agreement (which is apparently with the Debtor's own principal), and any commissions being offered to buyer's brokers/realtors thereunder. Yet the Disclosure Statement does not contain a discussion of any of this.

In fact, the Disclosure Statement does not even describe the Property. IBI Falcon believes the Property is improved by a six bedroom, seven bedroom house. But that knowledge was gleaned by undertaking due diligence separate and apart from reviewing the Disclosure Statement—something creditors ought not have to undertake. The online listing for the Property proclaims "[t]his is a bespoke new construction home that was recently appraised at $5M. The seller has repriced it at an exceptional value, under $4M for immediate sale." *Id.* Yet none of this is in the Disclosure Statement, and creditors would certainly benefit from learning of the "recent" appraisal for $5 million and why it is that the Debtor has elected to market the Property for less than 80% of the apparent appraised value.

The Disclosure Statement also does not set forth any discussion of the Debtor's history. A deep dive into land records suggests the Debtor purchased a separate real estate asset, for $855,000.00, in 2022, and then sold the asset for $1.16 million in 2023. Yet that prior asset's address—despite being the Debtor's eponymous origin—is not listed on the statement of financial affairs as a previous location. *See* Statement of Financial Affairs, DE #21, at § 14; Amended Statement of Financial Affairs, DE #30, at § 14.

The Debtor should disclose what—if anything—this prior asset has to do with the current asset. If proceeds from the prior sale were used to buy the new property, a discussion of such would

10

seem necessary to assessing the Debtor's business history (such may actually enhance the Debtor's bona fides in the real estate space). If the proceeds were pocketed, creditors have the right to know that too. Yet, once again, no such information is contained in the Disclosure Statement.

Other issues similarly abound. By way of anecdote only, the Disclosure Statement indicated the Debtor will "continue to operate and manage their affairs as a debtor in possession pursuant to § 1184 of the Bankruptcy Code." Disclosure Statement, DE #121, at p. 4. Yet this is not a Subchapter V case, so section 1184 is inapplicable. Moreover, the Disclosure Statement indicates equity is not impaired, *id.* at § 7.2, whereas the Plan indicates equity *is* impaired, *see* Plan, DE #120, at § 5.5(B). And the Disclosure Statement does not contain a liquidation analysis or any discussion of the approximate professional fees incurred by the Debtor in connection with this case.

At bottom, the Disclosure Statement comes well short of furnishing adequate information. And, just as the Disclosure Statement ought not be approved because the Plan is unconfirmable, denial is also appropriate since the Debtor has not satisfied the core obligation of section 1125.

### III.     Conclusion

WHEREFORE, IBI Falcon respectfully prays this Honorable Court (i) sustain this objection; (ii) deny approval of the Disclosure Statement; and (ii) afford such other and further relief as may be just and proper.

*[Signature on Following Page]*

11

Respectfully submitted,

Dated: March 17, 2026

By: /s/ Maurice B. VerStandig
  Maurice B. VerStandig, Esq.
  Bar No. 18071
  The VerStandig Law Firm, LLC
  9812 Falls Road, #114-160
  Potomac, Maryland 20854
  Phone: (301) 444-4600
  Facsimile: (301) 444-4600
  mac@mbvesq.com
  *Counsel for IBI Falcon US LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of March, 2026, a copy of the foregoing was served electronically upon filing via the ECF system, with copies to:

- Deirdre Theresa Johnson   dtjesq@dtjohnsonlaw.com
- L. Jeanette Rice   Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- US Trustee - Greenbelt   USTPRegion04.GB.ECF@USDOJ.GOV
- Maurice Belmont VerStandig   mac@mbvesq.com, lisa@mbvesq.com;mahlon@dcbankruptcy.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email

   /s/ Maurice B. VerStandig
   Maurice B. VerStandig

12