IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | | |
|---|---|---|
| In re: | &#124; | |
| | &#124; | |
| 5410 30th Street DC, LLC, | &#124; | Case No.: 25-19605 |
| | &#124; | |
| Debtor | &#124; | Chapter 11 |
| | &#124; | (Relates to Adv. Pro. No. 26-00129) |
| | &#124; | |

## DEBTOR'S OBJECTION TO APPROVAL OF IBI FALCON US LLC'S

## DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION

5410 30TH STREET DC LLC, Debtor and Debtor-in-Possession ("Debtor"), by and through counsel, respectfully submits this Objection to the Disclosure Statement and Chapter 11 Plan of Liquidation (the "Plan") filed by IBI Falcon US LLC ("IBI") and states as follows:

## INTRODUCTION

IBI's Disclosure Statement and Plan of Liquidation fail to meet the fundamental requirements of the Bankruptcy Code. The Disclosure Statement does not contain "adequate information" as required by 11 U.S.C. § 1125, denying creditors the ability to make an informed judgment about the Plan. The Plan itself violates multiple confirmation requirements under 11 U.S.C. § 1129, including the best interests test, the unfair discrimination prohibition, and the feasibility requirement. The proposed Plan is fundamentally flawed in both design and execution. It proposes a fire-sale auction with a minimum bid of only $400,000 for property the Debtor values at $5,000,000 and that has been actively marketed for several million dollars. The Plan grants IBI and its counsel complete control over the auction process while excusing IBI from posting the $150,000 deposit required of all other bidders, creating an inherent conflict of interest and chilling

competitive bidding. Most troubling, the Plan attempts to transfer all undisclosed estate assets and causes of action—including the Debtor's pending automatic stay claims against IBI—to the successful bidder without providing creditors any meaningful information regarding their value or likelihood of success. This transfer provision is vague, overbroad, and fails to provide the specificity required for creditors to make an informed judgment about the Plan. For these reasons and those set forth below, the Court should deny approval of the Disclosure Statement and deny confirmation of the Plan.

## STATEMENT OF FACTS

The Debtor is a Maryland limited liability company formed on February 14, 2023. IBI's Disclosure Statement notes that the Debtor "is not presently—and does not appear to have ever been—registered as a foreign entity in the District of Columbia." Even if accurate, this observation is immaterial: an out-of-state LLC's mere ownership of a single parcel of District real estate does not, without more, constitute "doing business" in the District so as to trigger foreign-entity registration requirements. D.C. Code § 29-105.02; D.C. Dep't of Licensing & Consumer Protection, Corporations Division, Business Registration FAQs (registration generally required only where the real estate held is income-producing).The Debtor acquired the real estate commonly known as 5631 MacArthur Blvd., NW, Washington, DC 20016 (the "Real Estate") on or about May 3, 2023, for $1,500,000.00. The acquisition was funded, at least in part, by a loan in the amount of $2,222,000.00 from FTF Lending, LLC.   IBI Falcon purports to be the current holder of the correlative promissory note, which is secured by a lien on the Real Estate.

The Real Estate was listed for sale on or about August 29, 2025, for $4,645,000.00. The Debtor scheduled the Real Estate as having a value, as of the Petition Date, of $5,000,000.00, in accordance with an independent professionally-prepared pre-petition appraisal of the property. The asking price was subsequently reduced multiple times: to $4,445,000.00 on or about October 16,

2025; to $4,295,000.00 approximately nine days later; and again to $3,999,900.00 in or about November 2025. The asking price was increased by one dollar on or about February 17, 2026. The Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025. Throughout the duration of this case, the Debtor has remained in possession and has filed regular operating reports. On April 14, 2026, IBI filed its Disclosure Statement and Chapter 11 Plan of Liquidation. The Plan provides for the Real Estate to be auctioned on the courthouse steps with a starting bid of only $400,000.00. The required deposit to bid is $150,000.00, though IBI is not required to post a deposit and is permitted to credit bid its claim. The Plan also provides that any undisclosed assets discovered between the date the Plan is proposed and the fifth anniversary of the Effective Date shall accrue to the benefit of the Successful Bidder.

IBI's status as the holder of that note, however, is itself disputed: as set forth in Section 7 of the Argument, below, the Debtor has a pending motion asking this Court to determine that IBI is not a "party in interest" at all. Contrary to any suggestion that "little has been done to advance a liquidation of the Real Estate," the Debtor has continuously and actively marketed the Real Estate since before the Petition Date. The Real Estate has been listed on Bright MLS (the multiple listing service covering the District of Columbia, Maryland, and Virginia) continuously since August 29, 2025, under listing number DCDC2215732. The listing has been managed by the Debtor's sole member, Zanetta Williams, who is a licensed REALTOR® affiliated with Keller Williams Capital Properties in Washington, D.C.—a fact IBI's own Disclosure Statement concedes, acknowledging that "…the Real Estate appears to be listed by the Debtor's principal who appears to be a licensed real estate agent." The Debtor has responded to market conditions by adjusting the listing price on four occasions and, as set forth more fully below, obtained an independent, professionally-prepared appraisal of the Real Estate in October 2025 supporting its scheduled value. These are the actions of a debtor actively and professionally marketing its principal asset toward a value-maximizing sale in the ordinary course, not a debtor sitting idle in need of a fire-sale, ten-business-day-notice auction on the courthouse steps.

## LEGAL STANDARD

To obtain approval of a disclosure statement, the plan proponent must demonstrate that the disclosure statement contains "adequate information" as defined in 11 U.S.C. § 1125(a)(1). 11 USCS § 1125 "Adequate information" means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 USCS § 1125 The determination of whether a disclosure statement contains adequate information is made on a case-by-case basis and is largely within the discretion of the bankruptcy court. *Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989)* However, the fundamental requirement remains constant: the disclosure statement must provide creditors with sufficient information to make an informed judgment about the plan. *Id.* To confirm a plan, the proponent must establish that the plan satisfies all applicable requirements of 11 U.S.C. § 1129(a), including that: (1) the plan complies with applicable provisions of the Bankruptcy Code; (2) the plan proponent has complied with applicable provisions of the Bankruptcy Code; (3) the plan has been proposed in good faith; (4) the plan satisfies the best interests test; (5) the plan does not discriminate unfairly; (6) the plan is fair and equitable with respect to each impaired non-accepting class; and (7) confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization.

## ARGUMENT

**THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION UNDER 11 U.S.C. § 1125**

**1. Legal Standard for Adequate Information**

Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as information that would enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class to make an informed judgment about the plan. 11 U.S.C. § 1125 The disclosure statement must provide information "of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records." 11 U.S.C. § 1125

The Fourth Circuit has emphasized that disclosure statements must provide creditors with meaningful information to permit informed voting. *Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989)* While the determination is case-specific and within the bankruptcy court's discretion, the fundamental requirement is that creditors receive sufficient factual and financial information to evaluate the plan and compare it to alternatives. *Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989)*

The disclosure statement must contain more than speculation, assumptions, and argument. Material facts must be disclosed, particularly concerning asset valuation, liquidation analysis, projected recoveries, and treatment of estate assets. Omission of material facts renders a disclosure statement inadequate under § 1125, just as incomplete disclosure in a securities prospectus violates securities laws. *SEC v. Am. Realty Tr., 586 F.2d 1001 (4th Cir. 1978)*

**2. The Disclosure Statement Lacks Competent Valuation Evidence**

The Disclosure Statement provides no competent valuation of the Real Estate, the Debtor's principal asset. IBI repeatedly suggests values materially below the Debtor's scheduled value of $5,000,000 yet provides no appraisal, broker opinion of value, expert report, or other evidentiary basis for these suggestions.

IBI notes that the Real Estate is currently marketed for "less than $4,000,000.00" but fails to explain why the property should be auctioned with a minimum bid of only $400,000.00—a figure representing a mere 8% of the Debtor's scheduled value and approximately 10% of the current asking price. This extraordinary discrepancy between the property's marketed value and the proposed minimum bid is unexplained and unsupported by any valuation methodology or market analysis.

The asserted value of the Real Estate is not simply the Debtor's say-so. The Debtor obtained an independent appraisal of the Real Estate from Emmanuel Nimako of Shabach Realty Services, Inc., a D.C.-certified residential real estate appraiser (Certification No. CR2002017), with an effective date of October 11, 2025—three days before the Petition Date. Using the sales comparison approach and comparable sales within a one-mile radius, the appraisal valued the Real Estate at $5,050,000.00, a figure that exceeds, rather than undermines, the Debtor's scheduled value of $5,000,000.00. A true and correct copy of this appraisal is attached hereto as Exhibit 1; it was also previously furnished to IBI as an exhibit to the Debtor's opposition to IBI's motion to convert this case from Chapter 11 to Chapter 7. IBI's suggestion that the Debtor's scheduled value is unsupported ignores this appraisal entirely.

The Disclosure Statement contains only vague assertions "upon information and belief" regarding asset values. IBI states that it is "not presently in a position to conclusively and definitively assert" whether the Debtor holds causes of action beyond the Real Estate. Such equivocal statements fall far short of the factual specificity required under § 1125.

A hypothetical investor cannot make an informed judgment about recovery prospects without competent evidence of the estate's most significant asset. The absence of any valuation

methodology, comparable sales analysis, or expert opinion renders the Disclosure Statement inadequate as a matter of law. Creditors are entitled to know whether the proposed auction procedures are reasonably likely to achieve fair market value or whether they represent a liquidation at a fraction of the property's worth.

**3. The Disclosure Statement Contains a Defective Liquidation Analysis**

The Disclosure Statement fails to provide a meaningful liquidation analysis comparing the proposed Plan to alternative scenarios. Although this case does not proceed under Subchapter V of Chapter 11, a meaningful liquidation analysis comparing recoveries under the Plan to recoveries under alternative scenarios is a well-established, customary component of adequate disclosure under 11 U.S.C. § 1125(a)(1), particularly where, as here, the Plan proposes to liquidate substantially all of the estate's assets.

The Disclosure Statement's discussion of alternatives is perfunctory and conclusory. IBI asserts that the Plan "is the best option for maximizing returns to creditors" without providing any comparative financial analysis. The statement that liquidation under Chapter 7 "would result in lesser distribution than proposed by the Plan" is unsupported by any calculation of Chapter 7 administrative costs, trustee fees, or projected sale prices.

A proper liquidation analysis must compare projected distributions under the Plan to distributions in a Chapter 7 liquidation or other alternative scenarios, including continued Chapter 11 administration with a structured sale process. The analysis must account for administrative expenses, professional fees, trustee compensation, and realistic projections of asset recovery under each scenario. The Disclosure Statement provides none of this information.

In bankruptcy valuation, courts take a conservative approach to protect creditors. *Bate Land Co. LP v. Bate Land & Timber LLC (Bate Land & Timber LLC), 877 F.3d 188 (4th Cir. 2017)* The Disclosure Statement's speculative assertions and lack of comparative financial analysis deny creditors the ability to assess whether the proposed Plan truly maximizes value or whether alternatives would produce superior recoveries. This deficiency alone warrants denial of approval.

**4. The Disclosure Statement Fails to Adequately Disclose Treatment of Causes of Action**

The Disclosure Statement provides grossly inadequate information regarding the Debtor's causes of action, including pending claims against IBI. IBI acknowledges that the Debtor "is also pursuing a claim—stemming from an alleged breach of the automatic stay—against IBI" and that "IBI vehemently denies having violated the automatic stay or having any monetary obligation to the Debtor." Yet the Disclosure Statement provides no information regarding: (1) the factual basis for the stay violation claim; (2) the potential value of the claim; (3) the stage of litigation; (4) the likelihood of success; or (5) how recovery on this claim would be distributed under the Plan.

More troubling, the Plan purports to transfer all "Causes of Action" to the Successful Bidder, with "Causes of Action" defined to include an extraordinarily broad sweep of potential claims. The definition encompasses "any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

This definition includes, without limitation, claims: (1) against any party that has filed a claim; (2) for avoidable transfers and preferences under §§ 542-550; (3) for surcharge under § 506(c); (4)

against current and former officers and directors; (5) under insurance policies; and (6) arising under § 362 (the automatic stay). Yet the Disclosure Statement provides virtually no information about these potential claims, their value, or their likelihood of success.

Creditors have no basis to evaluate whether they would receive greater recoveries if these claims were prosecuted for the benefit of the estate rather than transferred to the Successful Bidder. The inherent conflict of interest—IBI is both the plan proponent and a potential defendant in estate litigation—makes this omission particularly egregious. If IBI becomes the Successful Bidder through credit bidding, it would acquire the very claims pending against it, effectively extinguishing the estate's rights without any recovery to other creditors.

For creditors in Chapter 11 to make an informed judgment about whether to vote for the plan, they must know what property is part of the plan, whether that property is subject to any liens, and how those liens are being treated. *Universal Suppliers, Inc. v. Reg'l Bldg. Sys. (In re Reg'l Bldg. Sys.), 254 F.3d 528 (4th Cir. 2001)* This requirement applies with particular force to causes of action, which may represent significant value to the estate. The Disclosure Statement's failure to identify, describe, or value the estate's causes of action renders it inadequate under § 1125.

**5. The Disclosure Statement Relies on Speculation Rather Than Factual Information**

Throughout the Disclosure Statement, IBI makes assertions "upon information and belief" or based on speculation rather than verified facts. Examples include:

- "Upon information and belief, the Debtor also holds a de minimis sum of Cash on Hand."

- "Upon information and belief, the only administrative expense claimant herein is counsel for the Debtor."

- "It is not known if any such offers have been received."

- "While it is possible the Debtor holds certain Causes of Action, IBI is not presently in a position to conclusively and definitively assert such."

- "Upon information and belief, the Debtor is a pass-through entity for federal income tax purposes."

- "The Disclosure Statement asserts the DC Office of Tax & Revenue priority tax claim is 'believed to be' $43,292.42, rather than the $30,000.00 scheduled by the Debtor, without any explanation of the source, date, or basis for this larger figure."

- "Although the Plan itself establishes an Administrative Claims Bar Date (the first Business Day following the thirtieth calendar day after the Confirmation Date), the Disclosure Statement never discloses this deadline to creditors, depriving administrative claimants of adequate notice of the date by which they must assert their claims or be forever barred."

These hedged, speculative statements pervade the Disclosure Statement and prevent creditors from making informed judgments. A plan proponent who lacks basic information about the debtor's assets, liabilities, and administrative expenses cannot possibly provide adequate information to creditors. The appropriate remedy is to require IBI to conduct reasonable investigation and provide factual information rather than speculation.

### 6. Policy Considerations Support Requiring Adequate Disclosure

The disclosure requirements of § 1125 serve critical policy objectives in the bankruptcy system. Adequate disclosure ensures that creditors can make informed decisions about their economic interests, promotes fair voting on plans, and prevents plan proponents from obtaining confirmation through informational asymmetry or concealment.

These policies have particular force where, as here, the plan proponent is a secured creditor with interests potentially adverse to unsecured creditors and equity holders. IBI controls the information disclosed, structures the sale process, and stands to benefit from depressed bidding or inadequate competition. In this context, rigorous enforcement of disclosure requirements protects the integrity of the Chapter 11 process and ensures that all stakeholders can meaningfully evaluate the Plan.

The Fourth Circuit has recognized that good faith in plan proposal requires maximizing property available to satisfy creditors. *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.), 135 F.4th 185 (4th Cir. 2025)* This principle cannot be satisfied when creditors lack the basic information necessary to evaluate whether the proposed procedures will actually maximize value.

**Summary:** The Disclosure Statement fails to satisfy § 1125 because it lacks competent valuation evidence, provides no meaningful liquidation analysis, fails to adequately disclose the treatment of causes of action (including claims against IBI), and relies on speculation rather than factual information. These deficiencies prevent creditors from making informed judgments and warrant denial of approval.

## 2. THE PLAN IMPROPERLY EMBEDS SALE PROCEDURES RATHER THAN UTILIZING A SEPARATE § 363 SALE PROCESS

### 1. The Plan Conflates Plan Confirmation and Asset Sale Procedures

The Plan proposes to sell the Real Estate through a courthouse-steps auction with the auction occurring three weeks after confirmation and closing occurring within fifteen business days thereafter. This structure conflates two distinct processes: plan confirmation under §§ 1125-1129 and asset sales under § 363.

While § 1123(b)(4) permits a plan to "provide for the sale of all or substantially all of the property of the estate," and § 1123(a)(5)(B) requires plans to "provide adequate means for the plan's implementation, such as. transfer of all or any part of the property of the estate," these provisions do not eliminate the procedural protections and substantive standards applicable to sales of estate assets.

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." Good faith in plan proposal includes maximizing the value of assets available to satisfy creditors. *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.), 135 F.4th 185 (4th Cir. 2025)* The Plan's auction procedures—with a minimum bid representing only 8% of scheduled value, no marketing period, and IBI controlling the process—raise serious questions about whether the Plan will achieve this objective.

**2. The Plan Fails to Provide Adequate Sale Procedures to Maximize Value**

The proposed auction procedures are inadequate to maximize estate value. The Plan provides for:

- A minimum bid of only $400,000 (8% of scheduled value)

- An auction conducted "on the courthouse steps" with only ten business days' notice to creditors

- No marketing period beyond the property's existing listing

- No procedures for qualifying bidders, evaluating bids, or ensuring competitive bidding

- Complete control by IBI's designated auctioneer (IBI's counsel)

These procedures are antithetical to the duty to maximize estate value. Bankruptcy courts have long recognized that the objective in selling estate assets is to obtain the highest possible price for

the benefit of creditors. *Reid v. King, 157 F.2d 868 (4th Cir. 1946)*   When a higher bid is made before confirmation of a sale, courts may refuse to confirm the lower bid in order to maximize recovery. *Reid v. King, 157 F.2d 868 (4th Cir. 1946)*

Here, the Plan locks in inadequate sale procedures before any competitive process occurs. The minimum bid of $400,000 bears no relationship to the property's fair market value or even its liquidation value. The ten-day notice period provides insufficient time for potential bidders to conduct due diligence, arrange financing, or prepare serious offers. The lack of any pre-auction marketing or outreach virtually ensures limited participation.

A proper sale process would include: (1) a robust marketing period with professional marketing materials; (2) reasonable time for due diligence; (3) qualified bidder procedures; (4) baseline bidding protections and overbid increments; and (5) court oversight of bidding procedures. The Plan provides none of these protections.

### 3. The Plan's Auction Procedures Create Conflicts of Interest

The Plan grants IBI and its counsel complete control over the auction process, creating inherent conflicts of interest. IBI's counsel will designate the auctioneer, hold bidder deposits in trust, and prepare conveyance documents. IBI is both the plan proponent and the party most likely to benefit from depressed bidding.

As a secured creditor permitted to credit bid, IBI has a strong interest in acquiring the property at the lowest possible price. Every dollar by which the winning bid falls below fair market value is a dollar that flows to IBI (through credit bidding) rather than to junior creditors. This creates a perverse incentive for IBI to design sale procedures that chill competitive bidding and depress values.

The requirement that third-party bidders post a $150,000 deposit while IBI may credit bid without any deposit exemplifies this conflict. This asymmetry creates an insurmountable barrier for many potential bidders while giving IBI a substantial competitive advantage. A serious bidder must marshal $150,000 in cash or certified funds three business days before the auction, with no assurance of return if outbid, while IBI risks nothing.

Trustees and debtors in possession owe fiduciary duties to creditors of the estate. *Patterson v. Shumate, 912 F.2d 463 (4th Cir. 1990)*   A failure to maximize estate value may constitute a breach of those fiduciary duties. *Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet), 26 F.3d 481 (4th Cir. 1994)* While IBI is not the debtor in possession, as plan proponent IBI has assumed responsibility for proposing procedures to liquidate estate assets. Those procedures must be designed to maximize value, not to advantage IBI at the expense of other stakeholders.

**4. Policy Considerations Favor Rigorous Sale Procedures**

The policy of maximizing estate value serves fundamental bankruptcy objectives: preserving going concerns where possible and maximizing property available to satisfy creditors. *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.), 135 F.4th 185 (4th Cir. 2025)* While Chapter 11 permits liquidating plans, such plans must still employ procedures reasonably calculated to achieve fair value.

The Fourth Circuit has emphasized that plan confirmation requires good faith, which includes designing a plan that fairly achieves results consistent with the objectives and purposes of the Bankruptcy Code. *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.), 135 F.4th 185 (4th Cir. 2025)*    A plan that employs fire-sale procedures benefiting the secured creditor at the expense of junior stakeholders does not satisfy this standard.

Moreover, the conflation of plan confirmation and sale procedures denies creditors meaningful opportunity to object. If the sale were conducted as a separate § 363 sale motion, parties in interest could object to inadequate procedures, propose modifications, or seek to be heard on the propriety of the transaction. By embedding the sale in the Plan, IBI attempts to foreclose this oversight.

**Summary:** The Plan improperly conflates plan confirmation and asset sale procedures, provides inadequate procedures to maximize estate value, and creates conflicts of interest by giving IBI control over the auction process. These deficiencies violate the good faith requirement and warrant denial of confirmation.

### 3. THE PLAN VIOLATES THE BEST INTERESTS TEST UNDER 11 U.S.C. § 1129(a)(7)

**1. Legal Standard for the Best Interests Test**

Section 1129(a)(7) requires that each holder of a claim or interest in an impaired class must either accept the plan or receive or retain under the plan property of a value that is not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7. This is known as the "best interests of creditors" test.

To satisfy this test, the plan proponent must demonstrate that creditors will receive at least as much under the proposed plan as they would in a hypothetical Chapter 7 liquidation. This requires a meaningful liquidation analysis comparing projected distributions under the plan to distributions in Chapter 7, accounting for Chapter 7 administrative expenses, trustee fees, and realistic asset valuations.

The determination of what creditors would receive in Chapter 7 depends on proper valuation of estate assets. Liquidation value does not necessarily reflect earning power or going-concern value, but it must be based on competent evidence, not speculation. *In re Pembroke Manor Apartments, 547 F.2d 805 (4th Cir. 1977)*

**2. The Plan Fails to Demonstrate Compliance with the Best Interests Test**

The Plan cannot satisfy § 1129(a)(7) because the Disclosure Statement provides no meaningful information allowing creditors or the Court to determine whether recoveries under the Plan will exceed Chapter 7 liquidation recoveries.

The Disclosure Statement's liquidation analysis is perfunctory. IBI states that "liquidation under chapter 7 would result in lesser distribution than proposed by the Plan" because "[a]dministrative claims would be increased as a result of the chapter 7 trustee fees and related administrative expense claims." This conclusory assertion is unsupported by any financial analysis, calculation of trustee fees, or projection of administrative costs.

More fundamentally, the Plan's projected distributions are speculative because they depend entirely on an auction with unknown outcomes. The Plan provides no minimum recovery projections, no range of likely outcomes, and no basis for creditors to evaluate expected distributions. With a minimum bid of only $400,000, distributions to unsecured creditors could be zero, and even secured creditors could face deficiencies.

Compare this to a Chapter 7 liquidation, where a trustee would have a duty to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest. *Yadkin Valley Bank & Tr. Co. v. McGee (In re Hutchinson), 819 F.2d 74 (4th Cir. 1987)* The Chapter 7 trustee would be required to market the property professionally, seek

competitive bids, and maximize recovery. *Yadkin Valley Bank & Tr. Co. v. McGee (In re Hutchinson), 5 F.3d 750 (4th Cir. 1993)* The trustee's fiduciary duty to act expeditiously and maximize value would provide creditors with greater protection than the Plan's fire-sale procedures controlled by IBI.

### 3. The Plan's Treatment of Undisclosed Assets Undermines the Best Interests Analysis

The Plan provides that "should any unscheduled assets be discovered between the date on which this Plan is proposed and the fifth anniversary of the Effective Date, said assets shall accrue to the benefit of the Successful Bidder." This provision fundamentally undermines any liquidation analysis because it transfers unknown value from the estate to the Successful Bidder without consideration.

In a Chapter 7 liquidation, any subsequently discovered assets would be administered for the benefit of creditors. The Chapter 7 trustee would have a duty to pursue causes of action, recover preferential or fraudulent transfers, and maximize distributions. The Plan, by contrast, gives these assets to the Successful Bidder—most likely IBI through credit bidding—eliminating any potential benefit to other creditors.

This transfer is particularly prejudicial given IBI's acknowledgment that causes of action may exist but IBI "is not presently in a position to conclusively and definitively assert" their existence or value. If valuable causes of action exist, creditors could receive substantially greater recoveries in Chapter 7 than under the Plan.

### 4. Policy Considerations Support Rigorous Application of the Best Interests Test

The best interests test protects dissenting creditors from being forced to accept a plan that provides less than liquidation value. It ensures that Chapter 11 reorganization or liquidation provides a benefit compared to Chapter 7, rather than simply transferring value from creditors to favored parties.

This protection is particularly important where, as here, the plan proponent is a secured creditor with interests potentially adverse to unsecured creditors. The best interests test prevents secured creditors from using Chapter 11 to acquire assets at below-market prices while leaving unsecured creditors with less than they would receive in Chapter 7.

The Fourth Circuit has emphasized that good faith in plan proposal requires maximizing value available to satisfy creditors. *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.), 135 F.4th 185 (4th Cir. 2025).* A plan that fails to demonstrate compliance with the best interests test cannot be confirmed in good faith.

**5. IBI's Own Plan Concedes That Its Priority Classifications Are Legally Unsupportable**

The Plan's own terms confirm that its proposed priority scheme is not merely speculative, but affirmatively incorrect. The Debtor has no employees and did not schedule any wage claims. Nonetheless, the Plan classifies the claims of T&AA Construction LLC and BHI Construction as Class 2 priority claims under 11 U.S.C. § 507(a)(4)—a priority reserved for "wages, salaries, or commissions . . . earned by an individual." 11 U.S.C. § 507(a)(4)(A). IBI's own Plan concedes that "neither [claim] appears to be entitled to any priority under section 507(a)(4) since neither is actually for 'wages, salaries, or commissions,'" yet nonetheless proposes to allow and pay these claims—$17,150.00 to T&AA Construction LLC and $15,150.00 to BHI Construction—as priority claims ahead of general unsecured creditors, "pending" an objection IBI has not yet filed.

This is not an immaterial defect. A plan proponent cannot propose priority-level treatment for claims that its own pleadings admit are not entitled to priority, particularly where doing so directly reduces the funds available to the general unsecured creditors in Class 3, who are already told they may receive nothing under the Plan. If these claims are not entitled to priority, they belong in Class 3 with the other general unsecured creditors, to be paid pari passu, not placed ahead of them by fiat. This misclassification independently undermines both the best interests test and the feasibility of the Plan, and reflects the same pattern of self-interested, unsupported treatment of claims that pervades the balance of the Plan and Disclosure Statement.

**Summary:** The Plan fails to satisfy the best interests test because it provides no meaningful liquidation analysis, offers speculative and potentially minimal distributions, and transfers undisclosed assets to the Successful Bidder rather than preserving them for creditors. These deficiencies violate § 1129(a)(7) and warrant denial of confirmation.

### 4.  THE PLAN DISCRIMINATES UNFAIRLY AND FAILS THE FAIR AND EQUITABLE REQUIREMENT UNDER 11 U.S.C. § 1129(b)

**1. Legal Standards for Unfair Discrimination and Fair and Equitable Treatment**

Section 1129(b)(1) permits confirmation of a plan notwithstanding non-acceptance by an impaired class if the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting class. These requirements protect dissenting creditors from plans that favor certain stakeholders at others' expense.

A plan discriminates unfairly if it treats similarly situated creditors differently without adequate justification. The legal rights of a non-accepting class must be treated consistently with the

treatment of other classes whose legal rights are similar, and no class may receive payments in excess of what it is legally entitled to receive.

For a plan to be "fair and equitable" with respect to a class of secured claims, the plan must either: (1) allow each secured creditor to retain its liens and receive deferred cash payments with a present value equal to its allowed secured claim; (2) provide the secured creditor with the "indubitable equivalent" of its claim; or (3) sell the property free and clear with liens attaching to proceeds.

For unsecured creditors, the "fair and equitable" requirement generally means that either: (1) each creditor receives property equal to its allowed claim; or (2) no junior class receives any distribution (the "absolute priority rule").

**2. The Plan Unfairly Discriminates by Granting IBI Unique Procedural Advantages**

The Plan discriminates unfairly against other creditors by granting IBI unique procedural advantages in the auction process. While third-party bidders must post a $150,000 deposit at least three business days before the auction, IBI is exempted from this requirement and permitted to credit bid without posting any deposit.

This asymmetry creates substantial unfair discrimination. The deposit requirement imposes significant barriers on third-party bidders: they must marshal substantial cash, assume the risk of forfeiture if they fail to close, and commit capital days in advance with no guarantee of success. IBI, by contrast, risks nothing and can wait until the auction to determine its bidding strategy.

The discrimination becomes more pronounced when combined with IBI's control over the auction process. IBI's counsel designates the auctioneer, holds deposits, and prepares conveyance documents. IBI thus controls every aspect of a process in which it is the favored bidder. This

arrangement benefits IBI at the direct expense of other stakeholders who might otherwise purchase the property and generate proceeds for distribution to junior creditors.

The Fourth Circuit has emphasized that plans must be fair and equitable in a broad sense, not just in the technical manner specified in § 1129(b)(2). *In re Bryson Props., XVIII, 961 F.2d 496 (4th Cir. 1992)* Where debtors carry their opportunity for self-dealing too far, confirmation must be denied even if technical requirements appear satisfied. *In re Bryson Props., XVIII, 961 F.2d 496 (4th Cir. 1992)* Here, IBI—though not the debtor—has structured a plan that provides itself with overwhelming advantages while imposing burdens on competitors.

### 3. The Transfer of Causes of Action Violates the Absolute Priority Rule

The Plan's provision transferring all undisclosed assets and causes of action to the Successful Bidder raises serious questions under the absolute priority rule. If unsecured creditors are not paid in full, equity holders should receive nothing. Yet the Plan contemplates that Class 4 (equity interests) may receive distributions if funds remain after paying all creditor classes.

More troubling, if IBI becomes the Successful Bidder through credit bidding at or near the $400,000 minimum, it would acquire all causes of action—including claims against itself—for minimal consideration. This would effectively transfer value from unsecured creditors (who would benefit from prosecution of causes of action) to IBI (who would acquire and extinguish those claims).

The exclusive right to acquire property through favorable bidding procedures constitutes "property" that a party receives or retains "on account of" a prior interest. *In re Bryson Props., XVIII, 961 F.2d 496 (4th Cir. 1992)* The Fourth Circuit has held that special opportunities for certain stakeholders to retain or acquire interests through new capital contributions or exclusive

bidding rights violate the fair and equitable requirement where they advantage insiders or favored parti*es. In re Bryson Props., XVIII, 961 F.2d 496 (4th Cir. 1992)*

Here, IBI's exclusive right to credit bid without posting a deposit, combined with control over auction procedures, constitutes a special opportunity to acquire estate property on favorable terms. This advantage flows from IBI's secured claim, but the procedures go beyond what § 1129(b)(2)(A) contemplates by suppressing competition and transferring additional value (causes of action) without adequate consideration.

**4. Policy Rationales Support Strict Scrutiny of Discrimination and Priority Violations**

The unfair discrimination and fair and equitable requirements protect the bankruptcy system's distributional hierarchy. Senior creditors should not receive more than they are owed, and junior creditors should not be forced to subsidize secured creditors' acquisitions of estate property at below-market prices.

These principles have particular force where a single creditor is singled out for preferential treatment. While § 363(k) generally permits secured creditors to credit bid, that right does not include the right to control auction procedures, waive deposit requirements for themselves while imposing them on others, or acquire causes of action without separate consideration.

The Fourth Circuit has recognized that plans must be proposed in good faith and must fairly achieve results consistent with bankruptcy objectives. *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.), 135 F.4th 185 (4th Cir. 2025)* A plan that advantages one creditor through procedural manipulation while claiming to treat all creditors fairly does not satisfy this standard.

**Summary:** The Plan unfairly discriminates by granting IBI unique procedural advantages, including exemption from deposit requirements and control over the auction process. The Plan's transfer of causes of action raises serious questions under the absolute priority rule. These violations of § 1129(b) warrant denial of confirmation.

### 5. THE PLAN CONTAINS IMPROPER EXCULPATION AND RELEASE PROVISIONS

**1. Legal Standards for Exculpation and Release Provisions**

Exculpation and release provisions in bankruptcy plans are subject to strict limitations. While § 1125(e) of the Bankruptcy Code provides limited protection for plan proponents and certain parties acting in good faith, courts scrutinize such provisions carefully to ensure they do not improperly shield parties from liability for fraud, gross negligence, or intentional misconduct.

Section 1125(e) provides that solicitation of plan acceptances in good faith and in compliance with applicable provisions of the Bankruptcy Code is protected, and the plan proponent is not liable for violation of securities laws. However, this statutory protection is narrow and does not extend to all conduct or immunize parties from all claims.

The Fourth Circuit and other courts have recognized that exculpation provisions must be narrowly tailored and cannot release parties from liability for fraud, gross negligence, willful misconduct, or intentional violations of fiduciary duties. Overly broad exculpation clauses that attempt to shield parties from liability beyond the scope of § 1125(e) are improper and warrant denial of confirmation.

**2. The Plan's Exculpation Provision Is Overly Broad**

The Plan contains an exculpation provision that purports to shield the Plan Proponent (IBI) from liability for "any act taken or omitted to be taken in connection with or related to the Case. including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan."

While the provision contains a carve-out for "fraud, gross negligence, and intentional misconduct," the breadth of the exculpation is troubling. The provision covers not merely solicitation activities protected by § 1125(e), but virtually any act or omission by IBI from the Petition Date through the Effective Date, including actions relating to the auction process, the treatment of causes of action, and control over estate assets.

This expansive exculpation is particularly problematic given IBI's conflicts of interest. IBI is simultaneously: (1) the plan proponent; (2) the secured creditor with the right to credit bid; (3) the party controlling auction procedures; and (4) the likely Successful Bidder who would acquire all estate causes of action, including claims against itself.

The exculpation provision could shield IBI from liability for: designing sale procedures that favor IBI over other bidders; failing to maximize estate value; transferring causes of action to itself through credit bidding; or other conduct that breaches fiduciary-like duties owed to the estate and its stakeholders. Such broad immunity exceeds the protections contemplated by § 1125(e) and improperly insulates IBI from accountability.

**3. The Exculpation Conflicts with IBI's Fiduciary-Like Duties**

While IBI is not the debtor in possession, as plan proponent IBI has assumed substantial responsibility for proposing procedures to liquidate estate assets and distribute proceeds. Courts have recognized that parties exercising control over estate assets or reorganization processes may owe fiduciary-like duties to creditors and other stakeholders. *Patterson v. Shumate, 912 F.2d 463 (4th Cir. 1990)*

A debtor in possession stands in the shoes of a trustee and has a duty to represent the interests of creditors. *11 U.S.C. § 1107(a)* A trustee must preserve the assets of the estate and is liable in his personal capacity if he willfully and deliberately violates his duties. *Patterson v. Shumate, 912 F.2d 463 (4th Cir. 1990)* Debtors in possession and trustees have fiduciary duties to pursue viable claims that would benefit the estate. *Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet), 26 F.3d 481 (4th Cir. 1994)*

IBI's exculpation provision attempts to shield itself from liability for decisions that may violate these principles—decisions about auction procedures, asset transfers, and treatment of claims. The provision effectively allows IBI to control a liquidation process designed to benefit itself while immunizing IBI from liability for any resulting harm to other stakeholders (except fraud, gross negligence, or intentional misconduct).

This arrangement is inconsistent with fundamental bankruptcy principles. Plan proponents who exercise control over estate assets should be accountable for their decisions, particularly where those decisions involve self-dealing or conflicts of interest. The exculpation provision improperly attempts to eliminate that accountability.

**4. Policy Considerations Require Narrow Tailoring of Exculpation Provisions**

Exculpation provisions serve a legitimate purpose: encouraging parties to participate in reorganization efforts without fear of vexatious litigation over good-faith business judgments. However, this purpose must be balanced against the need to hold parties accountable for misconduct, self-dealing, or breach of fiduciary duties.

The proper scope of exculpation is limited to acts taken in good faith in furtherance of the reorganization, with carve-outs for fraud, gross negligence, and willful misconduct. Exculpation should not extend to matters involving clear conflicts of interest, self-dealing, or decisions that benefit the exculpated party at the expense of the estate.

Here, the Plan's exculpation provision is not narrowly tailored. It covers IBI's control of auction procedures that favor IBI, IBI's decisions about transfer of causes of action (including claims against IBI), and IBI's structuring of a plan that provides IBI with unique advantages. These matters involve inherent conflicts and should not be subject to blanket exculpation.

**Summary:** The Plan's exculpation provision is overly broad, extends beyond the protections of § 1125(e), and improperly shields IBI from liability for conduct involving conflicts of interest and self-dealing. The provision should be narrowed or the Plan should be denied confirmation.

## 6.  THE PLAN FAILS TO SATISFY THE FEASIBILITY REQUIREMENT UNDER 11 U.S.C. § 1129(a)(11)

**1. Legal Standard for Feasibility**

Section 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the

debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This is known as the feasibility requirement.

For a liquidating plan, feasibility generally means that the plan can be consummated—that is, the debtor can complete the proposed liquidation and make the promised distributions. The plan proponent must demonstrate a reasonable probability that the plan will succeed and that the proposed transactions can be completed as contemplated.

Feasibility requires more than hope or aspiration. The plan must rest on a solid foundation showing that anticipated events will actually occur and that proposed procedures will generate the projected results. Speculative plans that depend on uncertain outcomes or unproven assumptions do not satisfy the feasibility requirement.

**2. The Plan's Feasibility Depends on Speculative Auction Outcomes**

The Plan's feasibility is entirely dependent on the courthouse-steps auction generating sufficient proceeds to pay administrative claims, priority tax claims, and secured claims. Yet the Plan provides no evidence that the proposed auction procedures will achieve this result.

The Plan sets a minimum bid of only $400,000. IBI's own Disclosure Statement acknowledges uncertainty about whether funds will be available to pay Class 2 priority wage claims (capped at $17,150 each) and expresses doubt that any funds will be available for Class 3 general unsecured creditors. The Disclosure Statement states: "It is not reasonably known if there will be any monies available to pay the Claims of this Class."

This level of uncertainty demonstrates that the Plan is not feasible. If the auction generates only the minimum bid, administrative expenses and priority claims may consume the entire proceeds,

leaving IBI undersecured and other creditors unpaid. The Plan does not explain how distributions will be made if auction proceeds are insufficient, nor does it provide contingency procedures.

Moreover, the Plan conditions the Effective Date on "the Auction shall have fetched monies sufficient to pay Class 1, Class 2, and all Article 2 Claims in full." This condition acknowledges that the auction may not generate sufficient proceeds—yet the Plan provides no alternative if this condition is not satisfied. A plan whose effectiveness depends on an uncertain future event (an auction generating sufficient proceeds) is not feasible within the meaning of § 1129(a)(11).

### 3. The Plan's Marketing and Sale Procedures Are Inadequate to Ensure Feasibility

Even if the Real Estate has sufficient value to satisfy claims, the Plan's inadequate sale procedures make successful consummation uncertain. The Plan provides for only ten business days' notice of the auction, no pre-auction marketing beyond the property's existing listing, and no procedures to attract qualified bidders or ensure competitive bidding.

Courts have recognized that bankruptcy sales must be designed to maximize value for the estate. *Reid v. King, 157 F.2d 868 (4th Cir. 1946)* When sale procedures are inadequate—providing insufficient marketing time, inadequate notice, or inadequate opportunity for competitive bidding—courts may refuse to approve the sale or find that the plan cannot be implemented as proposed.

Here, the combination of minimal notice, no additional marketing, courthouse-steps location, substantial deposit requirements for third parties (but not IBI), and IBI's control of the process creates substantial uncertainty about whether the auction will attract serious bidders or generate fair value. This uncertainty undermines the Plan's feasibility.

**4. The Plan Provides No Contingency for Failed Auction**

The Plan states that if the Successful Bidder fails to close, the deposit is forfeited and a new auction is held. But the Plan does not address what happens if no qualified bids are received at the initial auction, or if the only bid is IBI's credit bid at or near the minimum.

A feasible plan must address foreseeable contingencies and provide procedures for completing the reorganization even if initial assumptions prove incorrect. The Plan's silence on these critical issues demonstrates lack of feasibility.

**5. Policy Considerations Support Rigorous Feasibility Analysis**

The feasibility requirement protects creditors from plans that promise distributions but cannot deliver. It ensures that confirmation is reserved for plans with a reasonable probability of success, not speculative proposals that may require subsequent liquidation or reorganization.

These policies have particular force in liquidating plans, where creditors' recovery depends entirely on successful asset sales and distributions. A plan proponent who cannot demonstrate that proposed sale procedures will generate adequate proceeds should not receive confirmation.

**Summary:** The Plan fails to satisfy the feasibility requirement because it depends on speculative auction outcomes, employs inadequate marketing and sale procedures, and provides no contingency for failed auctions. The Plan's uncertain feasibility warrants denial of confirmation.

## 7.  IBI FALCON LACKS STANDING TO PROPOSE A PLAN OR FILE A DISCLOSURE STATEMENT BECAUSE IT IS NOT A PARTY IN INTEREST

**1. The Debtor's Pending Motion Challenges IBI's Fundamental Standing**

Simultaneously with this Objection, the Debtor has pending before this Court its Motion for Determination That IBI Falcon US LLC Is Not a Party in Interest Pursuant to 11 U.S.C. §§ 101(5), 101(10), and 1109(b), and for Related Relief Barring IBI Falcon From Exercising Party-in-Interest Rights in This Case (the "Standing Motion"), filed April 15, 2026, together with the Debtor's Objection to Amended Proof of Claim No. 2 (the "Claim Objection"). The Claim Objection establishes that the instruments through which IBI purportedly acquired the promissory note and deed of trust encumbering the Real Estate—two alonges and two assignments of deed of trust—are void or ineffective under Article 3 of the Uniform Commercial Code, D.C. Code § 28:3-403, and D.C. Code § 21-2603.03, among other grounds, including the absence of any power of attorney recorded with or prior to the assignments it purports to authorize. If IBI's chain of title is void, as the Debtor submits it is, IBI has no "claim" against the Debtor within the meaning of 11 U.S.C. § 101(5), is not a "creditor" within the meaning of 11 U.S.C. § 101(10), and is not a "party in interest" within the meaning of 11 U.S.C. § 1109(b).

**2. A Non-Party-in-Interest May Not Propose a Plan or File a Disclosure Statement**

Section 1121(c) of the Bankruptcy Code permits "any party in interest" to file a plan once the debtor's exclusivity period has expired. 11 U.S.C. § 1121(c). Section 1125 likewise contemplates that a disclosure statement is filed in connection with a plan proposed by a proper plan proponent. If IBI is not a party in interest, it lacked standing to file the Plan (DE #129) and the Disclosure Statement (DE #130) in the first instance, and neither may be approved or confirmed, regardless of their substantive content. 11 U.S.C. § 1109(b). A party with no valid claim against the Debtor cannot simultaneously seek to liquidate the Debtor's estate and dictate, through a plan and disclosure statement of its own design, how the proceeds of that liquidation will be distributed.

**3. This Objection Is Independent of, and Reinforced By, the Pending Standing Motion**

The Debtor raises the deficiencies identified in Sections 1 through 6, above, regardless of the outcome of the Standing Motions, because the Plan and Disclosure Statement are independently defective on the merits. But the Standing Motions underscore why the Court should not approve the Disclosure Statement or confirm the Plan while IBI's fundamental status as a creditor and party in interest remains sub judice. At a minimum, the Debtor requests that the Court hold approval of the Disclosure Statement and confirmation of the Plan in abeyance pending resolution of the Claim Objection and the other Standing Motions, so that the estate's limited resources are not expended adjudicating a disclosure statement and plan proposed by an entity that may ultimately be determined to have had no standing to propose them at all.

**Summary:** In sum, IBI's standing to propose any plan or disclosure statement in this case is itself in genuine dispute. The Court should deny approval of the Disclosure Statement and confirmation of the Plan for the independent reasons set forth in Sections 1 through 6, above, and should further hold any consideration of the Plan and Disclosure Statement in abeyance pending resolution of the Debtor's Claim Objection and Standing Motion.

**CONCLUSION**

For the foregoing reasons, the Disclosure Statement fails to provide adequate information under 11 U.S.C. § 1125, and the Plan cannot be confirmed because it violates multiple mandatory requirements of 11 U.S.C. § 1129. The Disclosure Statement lacks competent valuation evidence for the Debtor's principal asset, provides no meaningful liquidation analysis, fails to adequately disclose the treatment of causes of action (including pending claims against IBI), and relies on speculation rather than verified facts. These deficiencies prevent creditors from making the informed judgment that § 1125 requires. 11 U.S.C. § 1125, *Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989)* The Plan itself violates core confirmation requirements. The proposed auction procedures—with a minimum bid representing only 8% of scheduled value,

no meaningful marketing period, and complete control vested in IBI and its counsel—fail to maximize estate value and violate the good faith requirement. *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.), 135 F.4th 185 (4th Cir. 2025)* The Plan discriminates unfairly by exempting IBI from the $150,000 deposit requirement imposed on all other bidders while giving IBI control over every aspect of the auction process. The Plan's transfer of all undisclosed assets and causes of action to the Successful Bidder—most likely IBI through credit bidding—deprives creditors of potential recovery sources without adequate disclosure or consideration. This transfer is particularly egregious given that it would allow IBI to acquire the very automatic stay claims currently pending against it, effectively extinguishing estate rights without any recovery to creditors. The Plan fails the best interests test because it provides no meaningful comparison to Chapter 7 liquidation and offers only speculative distributions dependent on an auction with inadequate procedures. The Plan's exculpation provision is overly broad and improperly shields IBI from accountability for self-dealing and conflicts of interest. And the Plan is not feasible because its success depends entirely on an auction process that provides no reasonable assurance of generating sufficient proceeds. The conflicts of interest pervading this Plan are manifest and disqualifying. IBI simultaneously serves as plan proponent, secured creditor, auction controller, potential defendant in estate litigation, and likely purchaser of estate assets—including claims against itself. This concentration of conflicting roles, combined with procedures designed to advantage IBI at every turn, demonstrates that the Plan cannot satisfy the Bankruptcy Code's requirements for good faith, fair and equitable treatment, and protection of creditor interests.

**WHEREFORE**, the Debtor respectfully requests that this Court:

1. Deny approval of the Disclosure Statement filed by IBI Falcon US LLC;

2. Deny confirmation of the Chapter 11 Plan of Liquidation filed by IBI Falcon US LLC;

3. Permit the Debtor a reasonable opportunity to propose an alternative plan or pursue alternative sale procedures that will maximize value for all stakeholders; and

4. In the alternative, or in addition, hold approval of the Disclosure Statement and confirmation of the Plan in abeyance pending resolution of the Debtor's Objection to Amended Proof of Claim No. 2 and Motion for Determination That IBI Falcon US LLC Is Not a Party in Interest; and

5. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Date: July 16, 2026

/s/ Deirdre T. Johnson. Esq
Deirdre T. Johnson, Esq.
Law Office of Deirdre T. Johnson, Esq.
9701 Apollo Dr, Suite 301
Upper Marlboro, MD 20774
(301) 742-5385
dtjesq@dtjohnsonlaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on the 16th day of July, 2026, I reviewed the Court's CM/ECF system and it reports that an electronic copy of the foregoing DEBTOR'S OBJECTION TO APPROVAL OF IBI FALCON US LLC'S DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION will be served electronically by the Court's CM/ECF system on the following:

Jeanette Rice, Chapter 11 Trustee Jeanette.Rice@usdoj.gov

Office of the United States Trustee USTPRegion04.GB.ECF@USDOJ.GOV

Maurice B. VerStandig, Esq.   mac@mbvesq.com

/s/ Deirdre T. Johnson, Esq